<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

MARJAC, L.L.C., et al.,          :

        Plaintiffs,        :             Civil Action No. 06-1440 (JAG)

                        :

         v.             :              **OPINION**

                        :

RICHARD TRENK, et al.,        :

                        :

                        :

                        :

                        :

        Defendants.       :

_____

<u>**GREENAWAY, JR., U.S.D.J.**</u>

      This matter comes before this Court on the motion by Defendants Richard Trenk, John McKeon, Susan Borg, Russell DeSantis, James Montgomery, and John Does A-Z (collectively "Defendants") seeking the grant of summary judgment, pursuant to FED. R. CIV. P. 56(c), against plaintiffs, MARJAC, L.L.C., DJF Realty, Inc., Mario LaVecchia and Jack Fiorenza, Jr. (collectively "Plaintiffs"). For the reasons set forth below, this motion shall be granted.[1]

_____

[1] Defendants seek the grant of summary judgment, pursuant to FED. R. CIV. P. 56(c). Defendants also properly filed a statement of undisputed material facts, pursuant to Local Rule 56.1. In Defendants' brief, however, they ask this Court to dismiss Plaintiffs' claims, with prejudice. The grant of summary judgment and the dismissal of the Complaint, with prejudice, are inconsistent. This Court will disregard the references to the dismissal of Plaintiffs' Complaint and treat Defendants' motion as one for the grant of summary judgment. <u>See</u> <u>Cheminor Drugs, Ltd. v. Ethyl Corp.,</u>168 F.3d 119, 121, n.2 (3d Cir. 1999) ("[T]he grant of summary judgment and the dismissal of the complaint are inconsistent" procedurally. The resolution of a motion for summary judgment does not lead to a dismissal of the complaint, only the grant or denial of summary judgment.)

1

## I.  **INTRODUCTION**

The individual Plaintiffs (Mario LaVecchia and Jack Fiorenza, Jr.) are the owners, through MARJAC, of a piece of property in West Orange that is the subject of this litigation. (Def. R. 56.1 Statement at ¶¶ 18-19.)  The Corporate entities they control are MARJAC and DJF Realty, Inc.  (Id. at ¶¶ 19-20.)  Plaintiffs sought to obtain approval for building a structure (the "Project") on the property, which Plaintiffs intended to operate as an upscale restaurant, lounge, and nightclub.  (Id. at ¶¶ 22, 78.)  Approval had to be obtained though the Planning Board of West Orange.  (Id.)  The critical events of this matter occurred following the October 21, 2002 special meeting of the Planning Board for the Township of West Orange ("Planning Board"), during which the Planning Board granted conditional approval of Plaintiffs' preliminary and final site plan application, along with certain variances requested by Plaintiffs.  (Id. at ¶¶ 78-79.)  The approval permitted Plaintiffs to build a structure, resulting in the Project. (Id. at ¶ 80.)

Approximately nineteen months later, the Township learned that the Project, as built, exceeded the footprint and building envelope of the building approved, in addition to numerous other violations of the approvals.  (Id. at ¶ 84.)  The Township issued a Stop Construction Order on June 16, 2004.  (Id. at ¶ 93.)  Plaintiffs filed suit to contest the issuance of the Stop Construction Order.  (Id. at ¶ 100.)  Plaintiffs' lawsuit was dismissed when the New Jersey Department of Community Affairs ("DCA") assumed jurisdiction over the Project.  (Id. at ¶ 108.)  After taking jurisdiction, the DCA issued three subsequent Stop Construction Orders (July 30,

_____

 we will disregard reference to the "dismissal" of Cheminor's complaint and treat the record as a summary judgment record.") (citations omitted).

2004, December 9, 2004, and July 27, 2006.)  (Id. at ¶¶ 110, 112, 114.)  The DCA issued the Stop Construction Orders because, as it explained, the "[c]onstruction differs than that shown on submitted construction documents.  Work exceeds scope of construction permit N.J.A.C. 5:23-2.14(a)." (Id. at ¶ 109.)

Instead of resolving the violations of the site plan approval found by the DCA by filing a completed site plan application in 2004 or later, as requested by Defendants, Plaintiffs filed the instant action.  (Id. at ¶¶ 123-24.)  On March 27, 2006, Plaintiffs filed this action in the Superior Court of the State of New Jersey.  Defendants removed the action to this Court.

In the Complaint, Plaintiffs asserted the following causes of action against Defendants: tortious interference with prospective economic advantage (Count I); tortious interference with contractual relations (Count II); violation of 42 U.S.C. § 1983 due to violations of the Commerce Clause, Fifth and Fourteenth Amendments of the Constitution of the United States (Count III); violation of the New Jersey Civil Rights Act, N.J. STAT. ANN. § 10:6-2(c) (Count IV); breach of fiduciary duty (Count V); legal malpractice (Count VI); civil conspiracy (Count VII); intentional infliction of emotional distress (Count VIII); estoppel (Count IX); and racketeering under N.J. STAT. ANN. § 2C:41-2 (Count X).

Defendants filed a motion to dismiss the Complaint, which was granted, in part, and denied, in part, in an Opinion of this Court dated December 19, 2006.  In the Opinion, this Court dismissed Plaintiffs' cause of action, pursuant to the Commerce Clause, and determined that Plaintiffs had abandoned their causes of action under the Fifth Amendment's Takings Clause, and the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States.  This Court also dismissed Plaintiffs' Legal Malpractice claim (Count VI); and Civil

3

Conspiracy claim (Count VII). (Opinion of December 19, 2006, Docket Entry No. 9.)  Count VIII

of Plaintiffs' Complaint, a claim for Intentional Infliction of Emotional Distress, was dismissed

by Consent Order executed by counsel for Plaintiffs and Defendants. (Consent Order, March 5,

2008, Docket Entry No. 25.)

Defendants now move for summary judgment on Plaintiffs' remaining claims:

tortious interference with prospective economic advantage (Count I); tortious interference with

contractual relations (Count II); violation of 42 U.S.C. § 1983 due to violations of the

Substantive Due Process Clause of the Fourteenth Amendment of the Constitution of the United

States (Count III); violation of the New Jersey Civil Rights Act, N.J. STAT. ANN. § 10:6-2(c)

(Count IV); breach of fiduciary duty (Count V); estoppel (Count IX); and racketeering under N.J.

STAT. ANN. § 2C:41-2 (Count X).

## II.  PARTIES

Plaintiff MARJAC, L.L.C. ("MARJAC") is a corporation, and the owner of real estate

located at 466 Prospect Ave (the "Property") in the Township of West Orange ("Township").

(Def. R. 56.1 Statement at ¶ 18.)  Plaintiff DJF Realty, Inc. ("DJF") is a corporation and owns a

liquor license.  (Id.)  Plaintiffs Mario LaVecchia ("LaVecchia") and Jack Fiorenza ("Fiorenza")

are individuals and own MARJAC.  (Id. at ¶ 19.)   DJF is also owned by LaVecchia and

Fiorenza.  (Id. at ¶ 20.)

Defendant John F. McKeon ("Mayor McKeon") is the current Mayor of the Township of

West Orange, and has held this position since 1998.  (Def. R. 56.1 Statement at ¶ 1.)  Mayor

McKeon was a West Orange Township Council member for six years prior to becoming mayor.

(Id. at ¶ 2.)  Defendant Richard Trenk ("Trenk") is currently Township Attorney of West Orange

4

and had served previously as Assistant Township Attorney from 1996-1998.  (Id. at ¶ 3.)  Trenk

has served as Township Attorney since 1998.  (Id.)  Defendant Susan Borg ("Borg") is the

Director of Planning Development of the Township of West Orange and has held this position

since 1989.  (Id. at ¶ 7.)  Borg is a registered architect and has been licensed by the State of New

Jersey since 1980.  (Id. at ¶ 8.)

       Thomas Biondi was the Township Construction Official until sometime around the Fall

of 2003.  (Id. at ¶ 9.)  He also supervised Plaintiffs' Project for the construction department until

that time.  (Id.)  Victor Biondi, son of the former Construction Official Thomas Biondi, was the

plumbing contractor on Plaintiffs' Project.  (Id. at ¶ 10.)  Thomas Biondi granted approvals

related to rough water, sewer, and other work completed on the property by his son, Victor

Biondi.  (Id. at ¶ 11.)  Following Thomas Biondi's retirement, Defendant Russell DeSantis

("DeSantis") became the Township Construction Official.  (Id. at ¶ 14.)  Michael DeFrino

("DeFrino") is the current Township Electrical Sub-Code Official and has been since 1992.  (Id.

at ¶ 15.)

## III.  FACTS

       The crux of the instant dispute arises from the difference between the approvals granted

on the Project and the structure actually constructed.  (Id. at ¶ 84.)  Plaintiffs' intention was to

operate an upscale restaurant, lounge, and nightclub on the Property.  (Id. at ¶ 22.)

       The Planning Board Resolution PB-02-11 sets forth the findings and approvals of the

Planning Board relative to the property.  (Id. at ¶ 79.)  The as-built plans prepared by Plaintiffs

vary from the plans originally approved and reveal: an approximately three foot encroachment

extending approximately forty two feet on the southerly side of the building into the side yard

setback (expanding the footprint of the building; an HVAC unit installed in the southerly side yard setback beyond the three foot encroachment; an expansion in both size and use of the third floor of the structure; an expansion both in size and use for the basement of the building; an increase in the square footage in the building; the kitchen has never been submitted for approval by the Department of Health and yet was in the process of being constructed during the Township's last inspection; installation of an approximately 20 foot by 3 foot exterior mechanical duct on the easterly elevation protruding about 18 inches from the building; change in an entrance from a Bilco door to a corridor with a set of stairs; and a change in the approved plans for the front entrance of the building resulting in a change in height and square footage in the building as built.  (Id. at ¶ 80.)[2]

On June 16, 2004, DeSantis and Borg conducted an inspection of the Property which revealed the building as constructed far exceeded the site plan approved by the Planning Board. (Id. at ¶ 84.)  Following the June 16, 2004 site inspection, the inspectors issued a Stop Construction Order advising Plaintiffs that construction may resume upon application to the Planning Board for an amendment to the initial Planning Board resolution.  (Id. at ¶ 94.) Pursuant to the June 16, 2004 Stop Construction Order, Plaintiffs were required to seek an amended site plan approval with variances since the "as built" improvements differ from those approved by the Planning Board. (Id. at ¶ 95.)  The Township's position has always been that the original 2002 Planning Board approval did not permit the structure, as built, until an amended

---

[2] Plaintiffs do not dispute that the actual construction of the building varies from the original plan approved by the Planning Board but contend that "every step of the way, all changes included in the final construction plan prepared were approved by the Township Construction Department as construction changes.  None of these changes affect the site plan." (Plaintiffs' Rule 56.1 Statement, p. 30, at ¶ 80.)

site plan approval was granted.  (Id. at ¶ 96.)  LaVecchia agreed that Plaintiffs needed to go back

to the Planning Board for an amended site plan approval.  (Id. at ¶ 97.)  Jack Fiorenza agreed that

if a building is overbuilt, a Stop Construction Order would not be arbitrary or unwarranted.  (Id.

at ¶ 81.)

The law firm of Commisa & Campanile provided services to Plaintiffs from 2002 to

2004.  (Id. at ¶ 36.)  Vincent Commisa ("Commisa") handled legal work pertaining to Plaintiffs

development of the Property including, the purchase of the Property, financing, foreclosure

litigation, and resolution of parking issues.  (Id. at ¶ 37.)  Carmine Campanile ("Campanile")

represented MARJAC for the preliminary and final site plan approval of Plaintiffs' Project.  (Id.

at ¶ 38.)  Plaintiffs' legal counsel advised Plaintiffs that based on the issuance of the Stop

Construction Orders, Plaintiffs needed to file an amended site plan application.  (Id. at ¶ 98.)

Plaintiffs' legal counsel based his advice on his review of the Stop Construction Order and what

was stated therein, including the side yard change, which differed from the approved plan, and

the change in the front yard, which was built differently from the plan as approved.  (Id. at ¶ 99.)

Plaintiffs did not file an amended site plan application but instead filed an action in state court on

July 2, 2004.  (Id. at ¶ 100.)

Plaintiffs contend that any changes in the actual construction of the Property from the

plans, as approved by the Planning Board, were permitted as they were signed off on by the

Town Construction Official, Thomas Biondi.  (Id. at ¶ 101.)  Plaintiffs do not allege any

wrongdoing on the part of Thomas Biondi.  (Id. at ¶ 12.)  Following the issuance of the June 16,

2004 Stop Construction Order, LaVecchia called Mayor McKeon every day for a year.  (Id. at ¶

102.)  Plaintiff LaVecchia sent numerous letters to Mayor McKeon expressing complaints about

7

how Plaintiffs believed they were being treated by the Township.  (Id. at ¶ 103.)

Plaintiffs claim that Defendants tried to extort Plaintiffs by attempting to place arbitrary, economically destructive restrictions on Plaintiffs' liquor license such as lowering the occupancy from 511 to 250, and demanding that Plaintiffs close at midnight when every other licensee would close at 2:00 a.m.  (Id. at ¶ 44.)  Jack Fiorenza testified that he was not aware of Trenk attempting to extort him, MARJAC, or DJF Realty.  (Id. at ¶ 43.)

LaVecchia did not know Trenk prior to purchasing the property and the first time he met Trenk was on June 16, 2004.  (Id. at ¶ 87.)  LaVecchia handled the Planning Board approval process.  (Id. at ¶ 41.)  LaVecchia handled all issues related to construction.  (Id. at ¶ 40.)  Jack Fiorenza first met Trenk on the Property at the time the Code Official issued the initial Stop Construction Order.  (Id.)  Trenk had no involvement in Plaintiffs' Project until he became aware of issues concerning the approvals on the Project on or about June 16, 2004.  (Id. at ¶ 88.)

The Township requested that the New Jersey Department of Community Affairs ("DCA") take over the issuing of permits and providing inspections on the Property, as a result of the 2004 litigation in which the Plaintiffs raised allegations concerning Thomas Biondi giving approvals for overbuilding of the Project.  (Id. at ¶ 105.)  Defendants were concerned about a conflict of interest caused by the involvement of Thomas Biondi (the prior Construction Official) supervising inspections on the Property, while his son was the plumbing contractor on the Project.  (Id.)  DCA assumed jurisdiction over the Project on July 30, 2004, pursuant to N.J. STAT. ANN. § 52:27D-137, which permits DCA to assist the Township with inspection of construction sites.  (Id. at ¶ 106.)  Plaintiffs did not object to DCA taking over supervision of the Project in 2004.  (Id. at ¶ 107.)  Plaintiffs dismissed the 2004 litigation based on the DCA's

supervision of the Project.  (Id. at ¶ 108.)

On or about July 30, 2004, DCA issued a Stop Construction Order because the actual construction differed from what had been approved.  (Id. at ¶ 109.)  The July 30, 2004 Stop Construction Order issued by the DCA superseded the June 16, 2004 Stop Construction Order. (Id. at ¶ 110.)

On or about December 4, 2004, the DCA discovered that Plaintiffs were continuing to undertake construction of the Project without permits or inspections, resulting in the DCA issuing a Notice and Order of Penalty, which assessed a $2000.00 penalty for failure to obtain the necessary construction permit.  (Id. at ¶ 111.)  DCA issued an additional Stop Construction Order on or about December 9, 2004, finding that the Project was in violation of the State Uniform Construction Code Act for failing to obtain a construction permit and having the necessary inspections.  (Id. at ¶ 112.)

The DCA's December 9, 2004 Stop Construction Order did not contain any reference to whether the Project had valid Planning Board approvals.  (Id.)  The DCA's December 9, 2004 Stop Construction Order was amended to permit certain exterior items to be completed with restrictions on the completion of interior work.  (Id. at ¶ 113.)  The DCA specifically required that no interior work was to continue until a plan review had been completed and permits were issued. (Id.)

The DCA issued another Stop Construction Order on or about July 27, 2006, which remains in effect.  (Id. at ¶ 114.)  Plaintiffs have not filed any legal action against the DCA with respect to the Stop Construction Orders issued by the DCA.  (Id. at ¶ 115.)

Susan Borg wrote a letter to the DCA on December 3, 2004 because she received

correspondence saying that Plaintiffs intended to open for business in the near future and she believed that the DCA needed to be aware of Plaintiffs' intentions.  (Id. at ¶ 150.)  Borg sent the December 3, 2004 letter to DCA by mail, not by fax.  (Id. at ¶ 151.)  Borg's letter of December 3, 2004 bears a stamp confirming receipt by the DCA on December 14, 2004. (Id. at ¶ 152.)  A letter by Ralph Ferguson of the DCA to Susan Borg, sent in response to the December 3, 2004 letter of Ms. Borg to the DCA, sets forth that Ms. Borg should forward future correspondence to an alternate address to avoid delay.  (Id. at ¶ 153.)  The December 15, 2004 letter of the DCA to Borg requested that she provide the DCA with written confirmation that she is authorized to speak for the Planning and/or Zoning Board and advised Borg that the DCA would only react following receipt of such written confirmation.  (Id. at ¶ 154.)

On or about January 18, 2005, counsel to Plaintiffs in the State Court action sent a letter to Borg advising that Plaintiffs would soon apply for an amended site plan approval.  (Id. at ¶ 119.)  Plaintiffs, instead of seeking review of its amendments for site plan approval by the Planning Board, filed another state court action.  (Id. at ¶ 120.)  Plaintiffs filed an amended site plan application on August 30, 2005.  (Id. at ¶ 121.)  On September 6, 2005 Defendant Borg responded to Plaintiffs and listed thirty seven items that needed to be addressed before the Planning Board could schedule a hearing.  (Id. at ¶ 122.)  Plaintiffs' counsel exchanged correspondence with Defendant Borg and Assistant Township Attorney Kenneth W. Kayser concerning deficiencies in the amended site plan application but a resolution was not reached as this action was filed by Plaintiffs.  (Id. at ¶ 123.)  MARJAC and counsel did not take any further action after November 22, 2005 in order to resolve the amended site plan application deficiencies but could have provided additional information requested by the Township.  (Id. at ¶ 124.)

## IV.  STANDARD OF REVIEW

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Cascara v. Pomeroy, 313 F.3d 828, 832-33 (3d Cir. 2002).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  This Court shall "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007) (citation omitted).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence . . . ."  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

When the moving party has the burden of proof on an issue at trial, that party has "the burden of supporting their motions 'with credible evidence . . .  that would entitle [them] to a directed verdict if not controverted at trial.'"  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477 U.S. at 331); see also United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) ("When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." (emphasis in original)  (internal citations omitted).)  Once the moving party has satisfied its initial burden, the party opposing the motion must

11

establish that a genuine issue as to a material fact exists.  Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").  "If the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented."  Foster v. Morris, 208 F. App'x 174, 179 (3d Cir. 2006).

## V.  ANALYSIS

### A.  Plaintiffs' Section 1983 Claim

Section 1983 of Title 42 subjects to liability: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"Albright v. Oliver, 510 U.S. 266, 271 (1994) (citing Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)).  "The first step in any [§ 1983] claim is to identify the specific constitutional right allegedly infringed."  Albright, 510 U.S. at 271

(citing Graham v. Connor, 490 U.S. 386, 394 (1989), and Baker, 443 U.S. at 140). To establish a

viable § 1983 claim, a plaintiff must demonstrate that "the conduct complained of was

committed by a person acting under color of state law" and that the "conduct deprived the

plaintiff of his rights, privileges and immunities secured by the Constitution or laws of the United

States." Kost v. Kozakiewicz, 1 F.3d 176, 184 (3d Cir. 1993) (quoting Parratt v. Taylor, 451 U.S.

527, 535 (1981) overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327

(1986)).

"[T]o establish municipal liability, a plaintiff must prove either (a) an official policy or

custom which results in constitutional violations or (b) conduct by officials in authority evincing

implicit authorization or approval or acquiescence in the unconstitutional conduct." Popow v.

City of Margate, 476 F. Supp. 1237, 1245 (D.N.J. 1979) (citing Monell v. Dept. of Soc. Serv. Of

the City of N.Y., 436 U.S. 658 (1978)).[3]

In Count III of the Complaint, Plaintiffs contend that Defendants deprived Plaintiffs of

the use of their property and that Defendants abused their (Defendants') discretionary authority

through improper enforcement of the zoning laws.  Plaintiffs allege that Defendants' motives

were on the one hand, improper, based on personal and political animus, and on the other hand

arbitrary, capricious, unreasonable, oppressive, and based on unlawful criteria.  Plaintiffs argue

in their brief that Defendants "destroyed Plaintiffs' business and denied Plaintiffs the right to

even exist." (Plaintiffs' Brief at 9.)  Plaintiffs state that they have a right to be free from

harassment in their land development efforts and assert that Defendants have abused the zoning

---

[3] There is no evidence in this record that Defendants had, or sought to enforce, an official policy or custom which results in constitutional violations.

process to prevent them from completing the Project.  Plaintiffs argue that Defendants abused the zoning process to destroy Plaintiffs' business, as a result of clear bias against Plaintiffs' Italian heritage.  Plaintiffs further allege that Defendants violated their (Plaintiffs') constitutional right to substantive due process under the Fourteenth Amendment of the Constitution of the United States.

The Supreme Court of the United States has held that governmental action will only be found to have violated an individual's substantive due process rights when it "shocks the conscience."  Collins v. Harker Heights, 503 U.S. 115, 128 (1992).  As the Third Circuit has noted, its "cases have repeatedly acknowledged that executive action violates substantive due process only when it shocks the conscience but that the meaning of this standard varies depending on the factual context."  United Artists Theatre Circuit, Inc. v. Township of Warrington, PA, 316 F.3d 392, 399-400 (3d Cir. 2003). "The 'shocks the conscience' standard encompasses 'only the most egregious official conduct.'"  Id. at 400.

In support of Plaintiffs' argument that Defendants violated their rights to substantive due process Plaintiffs point to the facts set forth in their Complaint.  "Standing alone, the facts set forth in the Complaint state a claim as to whether Defendants violated substantive due process." (Plaintiffs' Brief at 9.)  Plaintiffs offer no additional statement, evidence, or proof that Defendants acted arbitrarily and capriciously to deprive them (Plaintiffs) of a property interest or that Defendants acted out of clear bias against Plaintiffs' Italian heritage.  "Mere speculation about the possibility of existence of such facts does not entitle [plaintiffs] to go to trial."  Development Group, LLC v. Franklin Township Board of Supervisors, et al., 162 Fed. App'x 158, 160 (3d Cir. 2006) (citing Sterling Nat'l Mortgage Co. v. Mortgage Corner, Inc., 97 F.3d 39,

45 (3d Cir. 1996)).

Plaintiffs have offered no evidence in support of their contention that Defendants acted out of personal or political animus towards the Plaintiffs or specifically that Defendants demonstrated bias against Plaintiffs as a result of their Italian heritage.  Plaintiffs' former attorney, Campanile, who represented MARJAC for the preliminary and final site plan approvals for the Project testified that he did not witness any actions that he viewed as evidencing an anti-Italian bias by or on behalf of any of the Defendants in this action.  (Def. R. 56.1 Statement at ¶¶ 38-39.)  Plaintiff Jack Fiorenza, Jr. testified at his deposition that other than his own conjecture, he had no support for the statement that perhaps Defendants do not like Italians.  (Id. at ¶ 43.)  Fiorenza also testified that he had no knowledge to support the allegation that Trenk had a personal reason to take any actions relative to the Project.  (Id. at ¶ 62.)

Plaintiffs offer no support for their allegation that Defendants abused the zoning process to destroy their business.  Plaintiffs also do not allege that the Defendants prevented them from seeking an amended site plan approval, which would have given them an opportunity to secure additional or amended approvals allowing them to complete the Project.  Plaintiffs had been given the opportunity to apply for an amended site plan approval but instead chose to pursue litigation rather than complete the application process.[4]  (Def. R. 56.1 Statement at ¶¶ 95-96.)  Plaintiffs concede that construction of the Project exceeded the site plan approvals granted by the

---

[4] This Court notes that once Plaintiffs completed an application for an amended site plan approval by the Planning Board, as required by Defendants, Plaintiffs were granted additional site plan approvals in a Resolution of the Planning Board, dated April 1, 2009.  Indeed, Plaintiffs are now moving forward to complete construction and open their facility.  (Certification of Susan Borg at ¶ 11.)

15

Planning Board.  (<u>Id.</u> at ¶¶ 80, 101.)  LaVecchia testified during his deposition that he agreed that Plaintiffs needed to go back to the Planning Board for an amended site plan approval.  (<u>Id.</u> at ¶ 97.)

Plaintiffs have only demonstrated that Defendants issued Stop Construction Orders after they (Defendants) discovered that Plaintiffs had exceeded their site plan approvals.  Both the Planning Board and the DCA issued Stop Construction Orders after learning that Plaintiffs' construction of the Project deviated from amended site plan approvals.  (<u>Id.</u> at ¶¶ 95, 109.) Plaintiffs offer only conjecture and unsupported allegations in support of their claims that Defendants' conduct in enforcing zoning regulations "shocks the conscience."  This Court finds that Defendants' conduct does not shock the conscience since Defendants were merely exercising their discretion and authority to enforce zoning laws, which Plaintiffs had clearly violated.  <u>See Development Group, LLC</u>, 162 Fed. App'x at 160-61 ("As for Development Group's claims of attempted bribery and violation of the Pennsylvania Sunshine Act, we cannot discern anything conscience-shocking in the behavior of which Development Group complains.  Rather, we interpret the Township's efforts to offer Development Group other development projects and Halsted's proposal that the parties should enter into settlement negotiations once the plans were rejected as reasonable attempts to resolve the dispute over the Miller Farm property.  Moreover, as the District Court noted, there is no evidence that any of the Defendants actually did anything illegal.  We therefore agree with the District Court that, "[e]ven when taken as a whole, Defendants' conduct, though harsh, was not so extreme as to shock the conscience.") (citations omitted).

Plaintiffs have failed to demonstrate that Defendants have deprived them of any

constitutional right and, as such, have failed to prove the elements of a section 1983 claim.

Plaintiffs have failed to raise a genuine issue as to a material fact as to whether they have been

deprived of a constitutional right (specifically, substantive due process).

Summary judgment is granted in favor of Defendants as to Plaintiffs' section 1983 claim.

### B.  Plaintiffs' New Jersey Civil Rights Act, N.J. STAT. ANN. § 10:6-2(C) Claim

N.J. STAT. ANN. § 10:6-2(C) provides:

> Any person who has been deprived of any substantive due process or equal
> protection rights, privileges or immunities secured by the Constitution or laws of
> the United States, or any substantive rights, privileges or immunities secured by
> the Constitution or laws of this State, or whose exercise or enjoyment of those
> substantive rights, privileges or immunities has been interfered with or attempted
> to be interfered with, by threats, intimidation or coercion by a person acting under
> color of law, may bring a civil action for damages and for injunctive or other
> appropriate relief.

In Count IV of their Complaint, Plaintiffs assert a violation of their civil rights.  Plaintiffs

are required to come forward with evidence that their constitutional rights, under the federal or

state constitutions, have been violated as a result of some state action.  Plaintiffs state in Count

IV of the Complaint that the basis for their claim under the New Jersey Civil Rights Act is the

alleged violation of their constitutional right to substantive due process, as articulated in Count

III of the Complaint.  Plaintiffs also argue in their brief that they are entitled to relief under the

New Jersey Civil Rights Act due to the substantive due process violation which forms the basis

of Plaintiffs' section 1983 claim in Count III of the Complaint.

Here, Plaintiffs fail to come forward with any evidence from which one could infer that

Plaintiffs' constitutional rights have been violated.  Since Plaintiffs' claim under N.J. STAT. ANN.

§ 10:6-2(C) is dependent upon Plaintiffs' success in proving that Defendants have deprived them

(Plaintiffs) of a constitutional right, as alleged in Count III, this claim must also fail.  Plaintiffs

17

have failed to raise a genuine issue as to a material fact concerning whether Defendants have violated their constitutional rights.

Summary judgment is granted in favor of Defendants as to Count IV of Plaintiffs' Complaint.

### C.  Plaintiffs' Claim for Tortious Interference With Economic Advantage

To state a claim for tortious interference with prospective business advantage, Plaintiffs must allege that: (1) they had "some protectable right," or "reasonable expectation of economic advantage;" (2) "the interference was done intentionally . . . without justification or excuse;" (3) "the interference caused the loss of the prospective gain;" and (4) "the injury caused the damage." Printing Mart-Morristown v. Sharp Electronics Corp., 563 A.2d 31, 37 (N.J. 1989). The Complaint must include allegations giving rise to some "reasonable expectation of economic advantage." Id.  The "gravamen of a claim for tortious interference is that the defendant's conduct was wrongful . . . thus requiring plaintiff to establish that defendant acted with malice . . . . Malice is the 'intentional doing of a wrongful act without justification or excuse.'" Coast Cities Truck Sales, Inc. v. Navistar International Transportation Co., 912 F. Supp. 747, 772 (D.N.J. 1995) (citations omitted).

Plaintiffs have failed to demonstrate that Defendants' actions were without justification. Defendants' issuance of the various Stop Construction Orders were in response to Plaintiffs' own violations of the Planning Board site approvals. (Def. R. 56.1 Statement at ¶¶ 80, 101.)  Plaintiffs subsequently refused to return to the Planning Board for an amended site plan approval, despite the recommendation of their counsel to do so.  (Id. at ¶¶ 97-98.)  There is no evidence in the record challenging the veracity and merit of the Stop Construction Orders.

Plaintiffs have failed to raise any genuine issues as to a material fact regarding whether Defendants acted without justification or cause in taking action to prevent Plaintiffs from continuing construction on the Project.  Needless to say, malice (intent or justification) is nowhere to be found or inferred.  The absence of these necessary elements of the claim for tortious interference means Plaintiffs' claim must fail.

Summary judgment is granted in favor of Defendants as to Count I of the Complaint for tortious interference with prospective economic advantage, based on Plaintiffs' inability to raise a genuine issue as to a material fact.

### D.  Plaintiffs' Tortious Interference with Contractual Relations Claim

"A complaint based on tortious interference must allege facts that show some protectable right–a prospective economic or contractual relationship.  Although the right need not equate with that found in an enforceable contract, there must be allegations of fact giving rise to some 'reasonable expectation of economic advantage.'  A complaint must demonstrate that a plaintiff was in "pursuit" of business. Second, the complaint must allege facts claiming that the interference was done intentionally and with "malice."  For purposes of this tort, '[t]he term malice is not used in the literal sense requiring ill will toward the plaintiff.' Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." Printing Mart-Morristown v. Sharp Electronics Corp., 563 A.2d at 37 (citations omitted).

In the Complaint, Plaintiffs allege that they entered into a series of contracts in connection with the creation, financing, and eventual operation of the business (Project), including but not limited to, an SBA loan and other contractual arrangements with banks and contractors.  Plaintiffs claim that Defendants have interfered with Plaintiffs' contractual relations

without justification.  (Compl. p. 10, at ¶ 2-3, Northgrave Cert. Ex. 1.)

Plaintiffs have failed to demonstrate that Defendants' actions were without justification. Defendants' issuance of the various Stop Construction Orders are the only actions alluded to or proposed.  Those orders were issued in response to Plaintiffs' own violations of the Planning Board site approvals. (Def. R. 56.1 Statement at ¶¶ 80, 101.)  Plaintiffs subsequently refused to return to the Planning Board for an amended site plan approval, despite the recommendation of their counsel to do so.  (Def. R. 56.1 Statement at ¶¶ 97-98.)

Plaintiffs have failed to raise any genuine issues as to a material fact regarding whether Defendants acted without justification or cause in taking action to prevent Plaintiffs from continuing construction on the Project.  The absence of this necessary element of the claim for tortious interference with contractual relations means Plaintiffs' claim must fail.

Summary judgment is granted in favor of Defendants as to Count II of the Complaint for tortious interference with contractual relations, based on Plaintiffs' inability to raise a genuine issue as to a material fact.

### E.  **Plaintiffs' Breach of Fiduciary Duty Claim**

"The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position." McKelvey v. Pierce, 173 N.J. 26, 57 (2002) (citations omitted).  "The fiduciary's obligations to the dependent party include a duty of loyalty and a duty to exercise reasonable skill and care." Id. (citing RESTATEMENT (SECOND) OF TRUSTS §§ 170, 174 (1959)).  "[T]he fiduciary is liable for harm resulting from a breach of the duties imposed by the existence of such a relationship." Id. (citing RESTATEMENT (SECOND) OF TORTS § 874 (1979)).

"Public officers hold positions of public trust, and stand in a fiduciary relationship to the people whom they have been appointed to serve." State v. Markt, 384 A.2d 162, 166 (N.J. Super. Ct. App. Div. 1978) (citing Driscoll v. Burlington-Bristol Bridge Co., 86 A.2d 201, 221 (N.J. 1952)). "They must serve the public with the highest fidelity." Id. "The citizen is not at the mercy of his servants holding positions of public trust nor is he helpless to secure relief from their machinations except through the medium of the ballot, the pressure of public opinion or criminal prosecution." Driscoll, 86 A.2d at 222. Whenever the acts of public officers fail to conform to the standard imposed by the fiduciary relationship in which they stand to the public, relief will be available in the civil courts. Id.

In Pressley v. Township of Hillsborough, 117 A.2d 646 (N.J. Super. Ct. App. Div. 1955), the Appellate Division set forth the duty owed by a public official:

> "As fiduciaries and trustees of the public weal they (municipal officers) are under an inescapable obligation to serve the public with the highest fidelity. In discharging the duties of their office they are required to display such intelligence and skill as they are capable of, to be diligent and conscientious, to exercise their discretion not arbitrarily but reasonably, and above all to display good faith, honesty and integrity." Id. at 648.

Under New Jersey law, breach of fiduciary duty is a tort claim requiring a showing of duty, breach, injury, and causation. In re ORFA Securities Litigation, 654 F. Supp. 1449, 1457 (D.N.J. 1987).

In the Complaint, Plaintiffs assert that Defendants violated a fiduciary duty owed to Plaintiffs by virtue of their status as public officials.[5] "As fiduciaries and trustees of the public,

---

[5] Plaintiffs do not claim that Defendants possessed a fiduciary duty to Plaintiffs specifically related to the Project. Instead, Plaintiffs argue that Defendants, by virtue of their status as public officials, owed a fiduciary duty to Plaintiffs as members of the public.

Defendants are under an inescapable obligation to serve the public, including taxpayers such as Plaintiffs, with the highest fidelity, intelligence, skill, diligence, conscientiousness, reasonableness, good faith, honesty, and integrity." (Compl. p. 15, at ¶ 3, Northgrave Cert., Ex. 1.)  Plaintiffs assert that Defendants breached that fiduciary duty by wantonly, recklessly, and maliciously engaging in intentional wrongdoing in the form of evil minded acts and/or acts characterized by a wanton and/or willful disregard of Plaintiffs' rights." (Id. at ¶ 8.)

Plaintiffs have failed to offer proof in any of their submissions that Defendants breached their fiduciary duty to the public or to Plaintiffs, as members of the public.  Defendants issued Stop Construction Orders when it was determined that Plaintiffs had violated the site plan approval given by the Planning Board.  (Def. R. 56. 1 Statement at ¶¶ 80, 101.)  Defendants urged Plaintiffs to seek amended site plan approvals, which ultimately Plaintiffs sought and obtained.  (Id. at ¶¶ 98-99; Certification of Susan Borg at ¶ 11.)  Plaintiffs point out no other objectionable acts or actions by Defendants that could provide a basis for a breach of fiduciary duty claim.  Plaintiffs can point to no right violated by the Defendants since Plaintiffs do not possess the right to disregard the decisions of the Planning Board regarding the site plan approval.  Plaintiffs violated the Planning Board's site plan approval, which served as the basis of the Stop Construction Orders.  (Def. R. 56.1 Statement at ¶¶ 80, 101.)

Defendants are obligated to enforce zoning provisions.  Deer-Glen Estates v. Board of Adjustment and Appeal of Borough of Fort Lee 121 A.2d 26, 29 (N.J. Super. Ct. App. Div. 1956), the New Jersey Superior Court, Appellate Division, provides that "[C]itizens . . . have a right to rely on the valid provisions of their zoning ordinance, and have a right to demand its protection."  By issuing Stop Construction Orders and directing Plaintiffs to apply for an

amended site plan approval, Defendants were merely enforcing the Township's zoning ordinances.

Plaintiffs have failed to raise a genuine issue as to a material fact as to whether Defendants breached their fiduciary duty to Plaintiffs. Summary judgment is granted in favor of Defendants as to Count V of Plaintiffs' Complaint.

### F. Plaintiffs' Claim Under New Jersey RICO

In Count X of the Complaint, Plaintiffs assert a civil RICO claim against Defendants, pursuant to N.J. STAT. ANN. § 2C:41-4(c), which provides: "Any person damaged in his business or property by reason of a violation of N.J.S.A. § 2C:41-2 may sue therefor in any appropriate court and shall recover threefold any damages he sustains and the cost of the suit, including a reasonable attorney's fee, costs of investigation and litigation."

New Jersey's Racketeering statute, N.J. STAT. ANN. § 2C:41-1 et seq., imposes liability on those who derive income from a pattern of racketeering activity. Specifically, § 2C:41-2(c) provides that "It shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

Five elements are necessary to prove a violation under N.J. STAT. ANN. § 2C:41-2(c): "(1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity." State v. Ball, 661 A.2d 251, 271 (N.J.

23

1995).

A "pattern of racketeering activity," according to N.J. STAT. ANN. § 2C:41-1(d), requires:

(1) Engaging in at least two incidents of racketeering conduct one of which shall have occurred

after the effective date of this act and the last of which shall have occurred within 10 years

(excluding any period of imprisonment) after a prior incident of racketeering activity; and

(2) A showing that the incidents of racketeering activity embrace criminal conduct that has either

the same or similar purposes, results, participants or victims or methods of commission or are

otherwise interrelated by distinguishing characteristics and are not isolated incidents." Id. at 261-

62.

Plaintiffs allege the existence of three predicate acts to establish a pattern of racketeering

activity: (1) wire fraud, in violation of 18 U.S.C. § 1343; (2) extortion, in violation of 18 U.S.C.

§ 1951; and (3) interference with Plaintiffs' federal Small Business Administration ("SBA")

loans, in violation of 18 U.S.C. § 245(b)(1)(B).  Plaintiffs have failed to offer evidence that any

of these predicate acts occurred.

In Count X of the Complaint, Plaintiffs allege that Defendant Borg committed wire fraud,

in violation of 18 U.S.C. § 1343, when she allegedly sent a fallacious facsimile to the DCA on

December 3, 2004 in which she questioned whether Plaintiffs' site plan approval for the Project

remained valid.  Plaintiffs assert that the approvals were valid.

Section 1343 provides that: "Whoever, having devised or intending to devise any scheme

or artifice to defraud, or for obtaining money or property by means of false or fraudulent

pretenses, representations, or promises, transmits or causes to be transmitted by means of wire,

radio, or television communication in interstate or foreign commerce any writings, signs, signals,

pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." Id.

Plaintiffs assert that the DCA issued a Stop Construction Order on December 9, 2004, in response to defendant Borg's alleged fax.  Ms. Borg's letter, dated December 3, 2004, sent to the DCA bears a date stamp indicating that it was received by the DCA on December 14, 2004. (Def. R. 56.1 Statement at ¶ 152.)  A letter by Ralph Ferguson of the DCA, dated December 15, 2004, in response to Ms. Borg's letter states that the DCA had received Defendant Borg's letter but would require additional information before the DCA would act on the information contained therein.  (Id. at ¶ 154.)  In addition, the response letter from the DCA directed Ms. Borg to use a different mailing address from the one she had used in the December 3, 2004 letter in order to avoid delay.  (Id. at ¶ 153.)  Plaintiffs offer no proof to contradict the evidence that Borg's letter was sent via regular mail.  (Id. at ¶ 151.)  In order to demonstrate wire fraud, Plaintiffs must demonstrate that Ms. Borg's letter was sent via *wire* rather than through regular mail.  "Both mail and wire fraud require a finding that defendant knowingly caused the use of the mails or a wire transmission, respectively."  U.S. v. Hitchens, 62 Fed. App'x 417, 418 (3d Cir. 2002).

Plaintiffs also fail to offer evidence of extortion on the part of Defendants.  The Hobbs Act, 18 U.S.C. § 1951(a) provides: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." Id.

In the Complaint, Plaintiffs allege only that Defendant Trenk attempted to extort them by

25

placing arbitrary restrictions on Plaintiffs' liquor license, with nothing more.  Plaintiff Jack

Fiorenza, Jr., however, testified that he is not aware of Trenk attempting to extort him,

MARJAC, or DJF Realty.  (Def. R. 56. 1 Statement at ¶ 44.)  Despite an allegation of extortion

against Trenk, LaVecchia has no idea what alleged benefit Trenk sought from Plaintiffs.  (Id. at ¶

64.)  Extortion requires proof of a benefit to the perpetrator or a benefit to another directed by the

perpetrator.  See United States v. Provenzano, 334 F.2d 678, 686 (3d Cir. 1964) ("[W]e hold that

it is not necessary to prove that the extortioner himself, directly or indirectly, received the fruits

of his extortion or any benefit therefrom.  The Hobbs Act does not require such proof.  It is

enough that payments were made at the extortioner's direction to a person named by him.")

Plaintiffs have offered no proof that Trenk received a benefit or directed a benefit to a third party.

Plaintiffs' allegation that Defendants interfered with their federal SBA loans and violated

18 U.S.C. § 245(b)(1)(B) requires an allegation that a person: "by force or threat of force

willfully injures, intimidates, or interferes with, or attempts to injure intimidate or interfere with

any person because he is or has been, or in order to intimidate such person or any other person or

any class of persons from participating in or enjoying any benefit, service, privilege, program,

facility or activity provided or administered by the United States."

Plaintiffs do not allege that any of the Defendants used force or the threat of force to

willfully injure, intimidate or interfere with any of the Plaintiffs participating in or enjoying any

benefit or service, or privilege,  program, facility, or activity provided or administered by the

United States.

Plaintiffs fail to offer evidence to support the predicate acts necessary to succeed on their

New Jersey state RICO claim, and fail to raise a genuine issue as to a material fact concerning

whether Defendants committed the predicate acts necessary for Plaintiffs' RICO claim to survive.[6]  By failing to establish the requisite predicate acts, Plaintiffs cannot demonstrate the violation of N.J. STAT. ANN. § 2C:41-2(c) by Defendants that is the underlying basis of a New Jersey civil RICO claim.

Plaintiffs have failed to raise a genuine issue of material fact as to whether Defendants committed two predicate acts.  Summary judgment is granted in favor of Defendants as to Count X of Plaintiffs' Complaint.

### G.  Plaintiffs' Equitable Estoppel Claim

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy." Highway Trailer Co. v. Donna Motor Lines, Inc., 217 A.2d 617, 621 (N.J. 1966).

Equitable estoppel "is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment." Knorr v. Smeal, 836 A.2d 794, 799 (N.J. 2003).

Plaintiffs allege that they received approvals from the Town Construction Official, Thomas Biondi, to engage in the construction that exceeded the plan approvals granted by the Planning Board.  Plaintiffs assert that they relied on these approvals when they exceeded the plan

---

[6] Plaintiffs' failure to provide the requisite predicate acts obviates the need to address each of the elements of a § 2C:41-2 claim individually.

approvals.

Authority to decide site plan applications is vested in the Planning Board.  Any change in site plan applications must be approved by the Planning Board which initially issued the approvals.  See Britwood Urban v. City of Asbury Park, 871 A.2d 129, 139 (N.J. Super. Ct. App. Div. 2005) ("[W]e also find merit in [the] argument that both the MLUL [Municipal Land Use Law] and the LRHL [Local Redevelopment and Housing Law] vest the Planning Board with exclusive authority to approve site plans.").

New Jersey law denies Plaintiffs the right to rely on approvals granted by the Township Construction Official which conflict with previously issued Planning Board approval decisions. See Deer-Glen Estates, 121 A.2d at 28 ("Plaintiff has never denied the existence of the side yard violations, and so the acting building inspector had no discretion to do anything but follow the requirements of the zoning ordinance and refuse the requested certificate of occupancy.  The inspector was an administrative official performing a purely ministerial act, exercising no discretion. Had he issued the certificate of occupancy in the face of an outstanding violation of the side yard provisions of the ordinance, his action would have been utterly void and subject to attack.").

Plaintiffs do not dispute that their construction of the Project exceeded the height and footprint approved by the Planning Board. (Def. R. 56.1 Statement at ¶ 101.)  Plaintiff LaVecchia agreed that Plaintiffs needed to return to the Planning Board for an amended site plan approval. (Id. at ¶ 97.)  Plaintiffs' legal counsel advised Plaintiffs that based on the issuance of the Stop Construction Orders, Plaintiffs needed to file an amended site plan application.  (Id. at ¶ 98.) Plaintiffs offer, as proof, an affidavit from Thomas Biondi, the Town Construction Official, in

28

which he stated that he granted approval to Plaintiffs to engage in construction changes. (Plaintiffs' R. 56.1 Statement at ¶¶ 31-32.)  Plaintiffs provide no proof that Thomas Biondi gave his approval to exceed the height and footprint approved by the Planning Board.  According to Biondi's affidavit, the only changes he approved were construction changes.

New Jersey law is clear that the Town Construction Official has no authority to grant deviations from the site plan approved by the Planning Board.  See Deer-Glen Estates, 121 A.2d at 28.  Defendants have directed Plaintiffs to apply for an amended site plan approval from the Planning Board, in accordance with applicable law.

Since no genuine issue as to a material fact remains concerning whether Defendants granted approval to Plaintiffs to exceed the height and footprint that had been approved by the Planning Board, which is the subject of the Stop Construction Orders, Plaintiffs' equitable estoppel claim must fail.  Summary judgment is granted in favor of Defendants as to Count IX of the Complaint.

## VI.  CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment shall be granted.


 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.


Date: July 13, 2009

29